# In the United States Court of Appeals for the Ninth Circuit

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff-Appellee*,<br><br>v.<br><br>PETER XUONG LAM,<br><br>*Defendant-Appellant*. | No. 12-50080<br><br>D.C. No. CR-07-449-PSG |

## Appellant's Opening Brief

Appeal from the United States District Court
for the Central District of California
Phillip S. Gutierrez, District Judge, Presiding

SEAN K. KENNEDY
Federal Public Defender
JAMES H. LOCKLIN
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012
Telephone: (213) 894-2929

Attorneys for Appellant

# Table of Contents

Page

Table of Authorities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

Issue Presented. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Notice of Comeback Case.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement re Addendum. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Statement of Jurisdiction.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Custody Status of Appellant. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Statement of the Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    1.  Statement of Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    2.  Statement of Facts.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        A.  Peter Lam, a naive and uneducated Vietnamese immigrant, was a pawn in Henry Nguyen's scheme to import mislabeled frozen fish fillets to avoid the payment of duties; while Nguyen and his father made millions, Lam earned just a modest salary.. . . . . . . . . . . . . . . . . 4

        B.  Because of the way forfeiture laws operate, Lam was hit with a $12.6 million money judgment, and even though the Eighth Amendment's Excessive Fines Clause is an important constitutional check on such forfeitures, the district court didn't even address Lam's argument that the forfeiture is unconstitutionally excessive.. . 13

Summary of Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Standard of Review.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Argument.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    The Court must vacate the forfeiture order under the Excessive Fines Clause of the Eighth Amendment.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        A.  The Eighth Amendment is an important safeguard that protects against the often harsh and unfair application of forfeiture statutes.. . 17

        B.  The $12.6 million forfeiture judgment is grossly disproportional to the gravity of Lam's offense and is therefore unconstitutional.. . . 22

# Table of Contents (continued)

Page

    C.    The Court should vacate the forfeiture order and remand for the limited purpose of having the district court reconsider the forfeiture.. 28

Certificate of Related Cases. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Certificate of Compliance re Brief Length. . . . . . . . . . . . . . . . . . . . . . . . . . 31

Addendum: Relevant Constitutional Provisions, Statutes, Rules, Etc.. . . . . . . . 32

    U.S. CONSTITUTION, Amendment VIII. . . . . . . . . . . . . . . . . . . . . . . . . . 33

    18 U.S.C. §545. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

    18 U.S.C. §982. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

    21 U.S.C. §853. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

    Fed. R. Crim. Proc. 32.2.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Certificate of Service. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

# Table of Authorities

Page

Cases

*Alexander v. United States*
    509 U.S. 544 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Austin v. United States*
    509 U.S. 602 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Libretti v. United States*
    516 U.S. 29 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Staub v. Proctor Hospital*
    560 F.3d 647 (7th Cir. 2009), *reversed*, 131 S.Ct. 1186 (2011). . . . . . . . . . . 23

*United States v. $100,348.00 in U.S. Currency*
    354 F.3d 1110 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 25

*United States v. 3814 NW Thurman Street*
    164 F.3d 1191, *amended*, 172 F.3d 689 (9th Cir. 1999). . . . . . . . . . . . . . 22, 25

*United States v. Bajakajian*
    524 U.S. 321 (1998). . . . . . . . . . . . . . . . . . . . . . . 17, 18, 20-22, 25, 27, 28

*United States v. Busher*
    817 F.2d 1409 (9th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . 21, 23, 26, 28

*United States v. Casey*
    444 F.3d 1071 (9th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

*United States v. Jalaram, Incorporated*
    599 F.3d 347 (4th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*United States v. Lam*
    444 Fed.Appx. 168 (9th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 15

*United States v. Littlefield*
    821 F.2d 1365 (9th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 28

*United States v. McHan*
    101 F.3d 1027 (4th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Newman*
    659 F.3d 1235 (9th Cir. 2011), *cert. denied*, 132 S.Ct. 1817 (2012). . . . . 18-20

*United States v. Van Brocklin*
    115 F.3d 587 (8th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Varrone*
    554 F.3d 327 (2nd Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

iv

# Table of Authorities (continued)

Page

<u>Statutes</u>

18 U.S.C. §371. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

18 U.S.C. §545. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 12, 13, 17, 25

18 U.S.C. §982. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17-19, 21

18 U.S.C. §3231. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. §3571. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

18 U.S.C. §3742. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

21 U.S.C. §853. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 21

28 U.S.C. §1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

<u>Rules</u>

Fed. R. App. Proc. 4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Ninth Circuit Rule 28-2.7. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

<u>United States Sentencing Guidelines</u>

U.S.S.G. §5E1.2.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

<u>Other Authorities</u>

BLACK'S LAW DICTIONARY (7th ed. 1999).. . . . . . . . . . . . . . . . . . . . . . . . . . 27

OXFORD ENGLISH DICTIONARY ONLINE (2012). . . . . . . . . . . . . . . . . . . . . . 23

# In the United States Court of Appeals for the Ninth Circuit

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff-Appellee,*<br><br>v.<br><br>PETER XUONG LAM,<br><br>*Defendant-Appellant.* | No. 12-50080<br><br>D.C. No. CR-07-449-PSG |

## Issue Presented

Peter Lam, a naive and uneducated Vietnamese immigrant, was a pawn in Henry Nguyen's scheme to import mislabeled frozen fish fillets to avoid the payment of duties. While Nguyen and his father made millions, Lam earned just a modest salary. Nevertheless, because of the way forfeiture laws operate, Lam was hit with a $12.6 million money judgment on top of a 41-month prison sentence. The Eighth Amendment's Excessive Fines Clause is an important constitutional check on such forfeitures. Is the $12.6 million forfeiture grossly disproportional to Lam's offense and therefore unconstitutional?

## Notice of Comeback Case

This is a "comeback case" for purposes of Ninth Circuit General Order 3.7. In July 2011, a panel of the Court (Rymer and Trott, CJJ, and Beistline, DJ) considered Lam's first appeal (Case No. 09-50265) and vacated his sentence and

1

the forfeiture order entered against him. *See United States v. Lam*, 444 Fed.Appx. 168 (9th Cir. 2011).[1]  Lam is now appealing the forfeiture order imposed on remand.

## Statement re Addendum

In accord with Ninth Circuit Rule 28-2.7, pertinent constitutional provisions, treaties, statutes, ordinances, regulations, and rules are set forth in the addendum attached to this brief.

## Statement of Jurisdiction

Peter Lam was found guilty on one count of conspiracy (18 U.S.C. §371) and three counts of trafficking in illegally-imported merchandise (18 U.S.C. §545).[2] The district court had jurisdiction over this case pursuant to 18 U.S.C. §3231.

In February 2012, the district court resentenced Lam after a remand from this Court.[3]  It entered its judgment on February 17.[4]  It also filed a preliminary order of forfeiture on February 13, which it amended two days later.[5]  On February 21, Lam filed a timely notice of appeal from the judgment and forfeiture order.[6]  *See* Fed. R. App. Proc. 4(b).

---

[1]  1 ER 7-9.
      "CR" refers to the clerk's record.  "ER" refers to the appellant's excerpts of record.  "SER" refers to the appellant's sealed excerpts of record.

[2]  CR 331, 332, 339; 2 ER 274-92; SER 1-4.

[3]  CR 573; 1 ER 10-39.

[4]  CR 574; 3 ER 382-86.

[5]  CR 569, 571; 1 ER 41-45.

[6]  CR 575; 3 ER 387.

This Court has jurisdiction to hear the present appeal from the final judgment and sentence of a district court pursuant to 18 U.S.C. §3742 and 28 U.S.C. §1291.

## Custody Status of Appellant

Lam is presently in the custody of the Bureau of Prisons serving his 41-month sentence. According to the BOP's inmate-locator website, his projected-release date is September 4, 2012.

## Statement of the Case

## 1. Statement of Proceedings

In May 2007, a federal grand jury in Los Angeles indicted 17 individuals and companies for allegedly conspiring to import mislabeled frozen fish from Vietnam (18 U.S.C. §371).[7] Peter Lam was charged in the conspiracy count as well as in three substantive counts of trafficking in illegally-imported merchandise (18 U.S.C. §545).[8] He was also named in a notice-of-forfeiture count.[9] Lam pled not guilty.[10]

---

[7]   CR 1; 2 ER 46-62.

[8]   2 ER 46-62, 68. In the original indictment, the conspiracy was charged in Count 1 and the substantive offenses naming Lam were charged in Counts 22-24, but the substantive counts were renumbered as Counts 2-4 in the redacted indictment filed at trial. (CR 331; 2 ER 274-92)

[9]   2 ER 70-72.

[10]   CR 33.

After an 11-day trial, a jury found Lam guilty of the charged offenses.[11]  The district court sentenced Lam to 63 months in prison and issued a forfeiture order.[12]  Lam appealed.[13]  This Court affirmed his convictions but vacated his sentence and the forfeiture order and remanded for resentencing.  *United States v. Lam*, 444 Fed.Appx. 168 (9th Cir. 2011).[14]

On remand, the district court sentenced Lam to 41 months in prison followed by a three-year term of supervised release; it also ordered him to pay a $400 mandatory special assessment, but it waived all fines.[15]  The district court also issued a preliminary order of forfeiture.[16]  Lam again filed a timely notice of appeal.[17]

## 2. Statement of Facts

    **A.**    **Peter Lam, a naive and uneducated Vietnamese immigrant, was a pawn in Henry Nguyen's scheme to import mislabeled frozen fish fillets to avoid the payment of duties; while Nguyen and his father made millions, Lam earned just a modest salary.**

Lam was born in Vietnam in 1959, a time of great turmoil in that country.[18]  His large family lived in poverty in the outskirts of Saigon, and when Lam was

---

[11]  CR 332, 339; SER 1-4.

[12]  CR 448, 458; 3 ER 324-27.

[13]  CR 451.

[14]  1 ER 7-9.

[15]  CR 573, 574; 1 ER 10-39; 3 ER 382-86.

[16]  CR 569, 571; 1 ER 41-45.

[17]  CR 575; 3 ER 387.

[18]  SER 19.

4

about 13, he had to leave school after completing the sixth grade so he could work.[19]  After a series of various jobs, he was taken in at a trade school, but he had to leave there when Saigon fell a short time later.[20]  After the Communist takeover, food was scarce, particularly for a large family like Lam's.[21]  In addition, Lam's family was of Chinese ancestry, a group that the new government discriminated against.[22]  Lam and other Chinese-Vietnamese young men were rounded up and sent to forced-labor camps.[23]  After several months, Lam escaped.[24]  Eventually, he made it onto a boat to Malaysia, where he ended up in a harsh refugee camp for 2½ years.[25]

In 1979, Lam entered the United States as a refugee.[26]  He immediately started working to support himself.[27]  Over the next few years, Lam moved around the country, chasing factory and restaurant work wherever he could find it.[28]  By 1982, at the age of 23, Lam settled in San Jose, where he stayed for the next 22 years.[29]  He became a U.S. citizen in 1991.[30]

---

[19]  SER 20, 24.

[20]  SER 20, 24-25.

[21]  SER 20.

[22]  SER 20.

[23]  SER 20.

[24]  SER 20.

[25]  SER 20-21.

[26]  SER 21, 23.

[27]  SER 21, 25.

[28]  SER 21, 25.

[29]  SER 21, 23.

[30]  SER 7, 19, 23.

In San Jose, Lam found employment on the assembly floors of some electronics companies for about 14 years.[31]  After that, he worked various jobs in restaurants and furniture stores.[32]  In 1998, he started selling seafood for a company, but he lost that job two years later when the company closed his department.[33]  From there, he went to work as a salesman for another San Jose seafood company owned by his cousin.[34]

By 2004, Lam's wife had abandoned the family and he was the sole caregiver for his then 7-year-old son.[35]  To provide for his son, Lam moved them to Virginia, where he accepted a job from Henry Nguyen.[36]  Nothing about Lam's background up to that point suggests any level of sophistication about the business world in general or the regulatory complexities of international trade in particular.

Naive and uneducated, Lam was exactly the kind of pawn Nguyen needed to further the criminal scheme he devised and implemented to import mislabeled frozen fillets of a fish species known scientifically as Pangasius hypophthalmus.[37]  The fish came from Cantho Animal Fishery Products Processing Export Enterprise (aka Cafatex), a Vietnamese company controlled by Nguyen's father.[38]  Effective January 2003, such fish coming from Vietnam was subject to "anti-dumping"

---

[31]  SER 25.

[32]  SER 25.

[33]  SER 25.

[34]  SER 24.

[35]  SER 21-22.

[36]  SER 22, 24.

[37]  2 ER 47-62, 275-90; SER 11-14.

[38]  2 ER 48, 276; SER 11-12.

duties.[39]  Cafatex paid anti-dumping duties of 45.55%.[40]  To avoid these duties in 2004 and 2005, Nguyen used an unknowing customs broker to facilitate the importation into the United States of millions of pounds of frozen Pangasius hypophthalmus mislabeled as other kinds of fish (like sole, carp, pike, etc.) that were not subject to the duties.[41]  In an attempt to shield Cafatex and themselves from criminal liability, Nguyen and his father shipped the fish through three Vietnamese export companies (Anhaco, An Giang Agricultural Technology Service Company (aka Antesco), and Binh Dinh Import Export Company) and then imported and sold the fish through four companies controlled by Nguyen and run out of a single office space located on Silver King Court in Fairfax, Virginia: Blue Ocean Seafood Corporation, Virginia Star Seafood Corporation, International Sea Products Corporation (ISP), and Silver Seas Company.[42]

After his scheme was discovered by the government, Nguyen fled the country, so neither he nor any of the companies he controlled have been brought to justice; the same is true of Cafatex and the other Vietnamese companies charged in the indictment.[43]  In fact, Lam and Arthur Yavelberg, two of the people who worked as salesmen for Nguyen at the Silver King Court location, were the only ones to stand trial for this conspiracy.[44]

---

[39]  2 ER 49-50, 75-78, 277-78; SER 12.

[40]  2 ER 76; SER 14.

[41]  2 ER 50, 55-56, 278, 283-84; SER 12-13.

[42]  2 ER 47-48, 55-56, 80-82, 85, 174, 183, 235, 275-76, 283-84; SER 11-14.

[43]  3 ER 388-93, 396-98.

[44]  Yavelberg was convicted of a lesser-included offense and received a sentence of only one year on probation.  (CR 443, 457)  Some of the purchasers of the fish in this country (including some who were alleged to be part of the conspiracy described in the indictment) pled guilty to relatively-minor offenses; they all received probationary sentences, except for one who received a year-and-a-day

At trial, Theresa Luong was the government's star witness as to the inner-workings of Nguyen's businesses at Silver King Court.[45]  Although Luong was no less active in furthering Nguyen's criminal scheme than Lam or Yavelberg, she was never charged as a co-conspirator or with any other crime.[46]

Luong started working for Nguyen in September 2004, around the same time as Lam began working for him.[47]  Luong described Nguyen as intimidating and a bully.[48]  She was afraid of him and he used fear to manipulate her.[49]  In fact, she said that he treated her like a slave.[50]

Nguyen was the president of Blue Ocean.[51]  To insulate himself from his illegal importations of mislabeled fish, he incorporated Virginia Star, ISP, and Silver Seas.[52]  Of course, Nguyen did not want to be formally in charge of these companies, so he made Lam the "president" of Virginia Star and ISP, and he made Yavelberg the "president" of Silver Seas.[53]  But these men were "presidents" in name only; Nguyen was in actual control of all of these companies.[54]  In fact, Nguyen decided "every little aspect of all of his businesses[.]"[55]  Notably, Blue

---

sentence.  (3 ER 398-404)

[45]  2 ER 79-255.

[46]  2 ER 46-72.

[47]  2 ER 79, 174, 238-40; SER 24.

[48]  2 ER 185.

[49]  2 ER 185.

[50]  2 ER 91.

[51]  2 ER 47, 275; SER 11.

[52]  2 ER 205; SER 12.

[53]  2 ER 86.

[54]  2 ER 85, 174, 181, 184-85, 235; SER 12.

[55]  2 ER 181.

Ocean, the only company *officially* headed by Nguyen, did not illegally import fish.[56]

Luong found herself in the same position as Lam and Yavelberg in May 2005, when Nguyen made her the president of ISP; in other words, she replaced Lam in that role.[57] When she was made president of ISP, there was no change in her salary, workspace, or responsibilities; she just had a new title.[58] She didn't have any actual control over ISP; Nguyen made all of the decisions.[59] Nguyen just wanted someone in that job besides himself.[60] Lam was the "president" of Virginia Star and ISP only to the same extent Luong was later the "president" of ISP; they were just figureheads.[61] This arrangement upset Luong because she felt like she was "stuck" in the president's position.[62] She said that Lam felt the same way.[63]

To facilitate the illusion that he was not in control of the companies, Nguyen had Lam sign two corporate stock sales agreements reflecting that, in the fall of 2004, he supposedly purchased shares in Virginia Star and ISP.[64] These "transactions" were a smokescreen. Luong testified that Nguyen would generate a lot of corporate documents like the stock sales agreements to put underlings in

---

[56] 2 ER 263, 265.

[57] 2 ER 168, 179, 252-53.

[58] 2 ER 180-81.

[59] 2 ER 181.

[60] 2 ER 181.

[61] 2 ER 200-01, 252-53.

[62] 2 ER 168, 201, 205, 252-53.

[63] 2 ER 201.

[64] 2 ER 96-99, 104-05, 161-63.

positions of apparent power.[65]  In fact, when Nguyen made Luong the president of ISP, he gave her some corporate documents to sign, although she couldn't remember exactly what they were.[66]  But even after she signed them, Nguyen still owned and ran the company.[67]  Likewise, Luong testified that, despite what the stock sales agreements suggest, Lam wasn't really the owner of Virginia Star and nothing changed in how that company was run after those agreements were executed.[68]  There was no question in Luong's mind that Nguyen made all of the decisions for Virginia Star and ISP, and when he wasn't in the office, Linh Tong (Nguyen's accountant) made the decisions for all of the companies.[69]  Luong understood that Nguyen used corporate documents like the stock sales agreements "to create a level of protection for himself" because he "wanted other people to be in the line of fire in case things unraveled[.]"[70]  Even the government argued to the jury that "Nguyen was yes, absolutely insulating himself and setting these companies up separately."[71]

As Luong explained, Nguyen did his best to compartmentalize the various aspects of the operation (importation, sales, distribution) such that, for example, the role of a salesperson like Lam was restricted to sales.[72]  The office assignments in the physical space at Silver King Court reflected Nguyen's dominant position. Lam and three other salesmen (including Yavelberg) shared a 10 feet by 20 feet

---

[65]  2 ER 203.

[66]  2 ER 204-05, 243, 253.

[67]  2 ER 205.

[68]  2 ER 203-04.

[69]  2 ER 86, 201-02.

[70]  2 ER 205.

[71]  2 ER 266.

[72]  2 ER 176-77, 179, 211.

10

bullpen in the interior of the office space.[73]  In contrast, Nguyen had a corner office.[74]  That office was generally kept locked, and only he and Tong had keys to it.[75]  Nguyen was also the only person with access to certain locked file cabinets.[76]

Luong confirmed that, in accord with Nguyen's compartmentalized operation at Silver King Court, Lam had nothing to do with the importation of the frozen fish fillets from Vietnam.[77]  He had no contact with the customs broker.[78]  He didn't even have access to the import files.[79]  Consistent with the illusion that Lam was the "president" of Virginia Star and ISP, his signature did appear on some of the sales contracts involving those companies' purchases of Vietnamese fish fillets.[80]  But Luong explained that, despite these signatures, Lam was not the person responsible for importing the product.[81]  Nguyen was just getting Lam's signatures on the documents because Lam was the figurehead for Virginia Star and ISP at the time.[82]  In fact, Nguyen had Luong sign similar documents when she was the president of ISP.[83]

---

[73]  2 ER 102, 273.

[74]  2 ER 101-02, 189-90, 273.

[75]  2 ER 189-90.

[76]  2 ER 190.

[77]  2 ER 210-12.

[78]  2 ER 210.

[79]  2 ER 210.

[80]  2 ER 106-13, 211-12.

[81]  2 ER 212.

[82]  2 ER 212.

[83]  2 ER 212.

Lam's only true job at Nguyen's Silver King Court offices was as the primary salesperson for Virginia Star.[84]  In 2004 and 2005, Nguyen and his father made millions of dollars; indeed, putting aside whatever other profits they may have made through their businesses, the government contended that they avoided over $7 million in anti-dumping duties.[85]  In contrast, Lam, a Vietnamese refugee who made $3,000 per month before working for Nguyen, made only $4,000 per month at Silver King Court during the approximately ten-month period that he was allegedly part of the conspiracy; Nguyen also allowed Lam to live rent free in a modest trailer that Nguyen owned.[86]  Lam received no sales commissions.[87]  In fact, Lam's salary was exactly the same as Luong's.[88]

Lam's limited role in Nguyen's scheme is also reflected in the jury's verdict. The government alleged (in Count 1) that Lam joined Nguyen's conspiracy with the intent to further five objectives: (1) to knowingly make and submit false records or labels involving the importation or sale of the fish, (2) to knowingly make or procure false statements in declarations on matters material to the activities of U.S. Customs, (3) to import the fish contrary to law and then sell it in this country in violation of 18 U.S.C. §545, (4) to knowingly effect entry of the fish by payment of less than the amount of duties legally due, and (5) to introduce the misbranded fish into interstate commerce with the intent to defraud.[89]  The government also charged Lam with three substantive violations of §545 (Counts 2-4), alleging that he sold the fish knowing that it had been imported or brought into

---

[84]  2 ER 202, 241.

[85]  SER 13.

[86]  2 ER 202, 247, 254-55, 258-59; SER 11, 14, 24.

[87]  2 ER 202.

[88]  2 ER 202.

[89]  2 ER 281-82.

the United States contrary to two laws: (1) it entered this country by payment of less than the amount of duties legally due, and (2) it was misbranded.[90]  In the end, however, the jury declared in its special verdict form that the government had only proved beyond a reasonable doubt that Lam joined a conspiracy involving objectives (3) and (5), and with regard to Counts 2-4, the jury concluded that the government had only proved beyond a reasonable doubt that Lam knew about the second purported violation of law.[91]  Thus the jury rejected the government's theory that Lam knew of, and intended to further, the full scope of Nguyen's scheme.

**B.**  **Because of the way forfeiture laws operate, Lam was hit with a $12.6 million money judgment, and even though the Eighth Amendment's Excessive Fines Clause is an important constitutional check on such forfeitures, the district court didn't even address Lam's argument that the forfeiture is unconstitutionally excessive.**

The indictment included a notice that the government would seek forfeiture of the illegally-imported fish if any of the defendants were convicted.[92]  After the trial, the government filed a motion for a preliminary order of forfeiture based on Lam's convictions for violating, and conspiring to violate, 18 U.S.C. §545.[93]  The forfeiture request had two components: (1) 267,570 pounds of frozen fish fillets that had been seized by the government, and (2) $12,578,676 worth of other frozen fish fillets that had been illegally imported but were not seized because they were

---

[90]  2 ER 291-92.

[91]  SER 1-4.

[92]  2 ER 70-72.

[93]  3 ER 294-302.

dissipated through sale and consumption over the course of the conspiracy.[94]  The second component was calculated "by taking the total value of the illegal merchandise introduced into the United States pursuant to the conspiracy from the time when defendant Lam joined it, conservatively on October 1, 2004, or $13,049,599, and subtracting $470,923, the value of seized merchandise that will be directly forfeited."[95]  Because the sold fish could not be seized, the government sought a money judgment against Lam in the full amount of $12,578,676.[96]

Lam did not oppose the forfeiture of the 267,570 pounds of frozen fish fillets that had been seized by the government because (as the evidence presented at trial established) he had no interest in or control over that fish anyway.[97]  He did, however, oppose the request for a $12.6 money judgment.[98]  Among other things, he argued that such a judgment would violate the Eighth Amendment's Excessive Fine Clause.[99]

At Lam's original sentencing, the district court signed the government's proposed preliminary order of forfeiture over Lam's objections.[100]  At the hearing, Lam explained that the $12.6 million judgment would be unconstitutionally excessive, but the district court simply granted the government's motion without

---

[94]  3 ER 296-97.

[95]  3 ER 297.

[96]  3 ER 298-301.

[97]  3 ER 304, 333.

[98]  3 ER 303-12.

[99]  3 ER 311-12.

[100]  1 ER 2-5; 3 ER 324-37.

responding to or otherwise addressing that argument.[101]  Subsequently, the Court issued a final order of forfeiture.[102]

Lam appealed his convictions, his sentence, and the forfeiture order.[103]  This Court affirmed his convictions but vacated his sentence due to a Guidelines-calculations error; it did not rule on his Eighth Amendment challenge to the forfeiture order, but it vacated that order to allow the district court to reconsider it at the resentencing.  *United States v. Lam*, 444 Fed.Appx. 168, 169-70 (9th Cir. 2011).[104]

On remand, the government renewed its motion for a preliminary order of forfeiture.[105]  And Lam again objected to the monetary judgment on the grounds that it would violate the Eighth Amendment.[106]  At the end of the resentencing hearing (where Lam received a 41-month sentence), the district court granted the government's forfeiture motion without giving any reasons for rejecting Lam's constitutional arguments.[107]  It therefore signed the forfeiture order providing for a personal money judgment against Lam for $12,578,676.[108]

## Summary of Argument

Peter Lam, a naive and uneducated Vietnamese immigrant, was a pawn in Henry Nguyen's scheme to import mislabeled frozen fish fillets to avoid the

---

[101]  1 ER 2-5.

[102]  3 ER 328-47.

[103]  1 ER 7-8; 3 ER 348-52.

[104]  1 ER 7-8.

[105]  3 ER 353-71.

[106]  3 ER 372-77.

[107]  1 ER 33-34, 39; 3 ER 382.

[108]  1 ER 41-45; 2 ER 378-81.

payment of duties.  While Nguyen and his father made millions, Lam earned just a modest salary.  Nevertheless, because of the way forfeiture laws operate, Lam was hit with a $12.6 million money judgment on top of a 41-month prison sentence. There is only one check on such outrageous forfeitures – the Eighth Amendment's Excessive Fines Clause.  Because the applicable forfeiture statute has been interpreted so broadly, it may well exceed constitutional bounds in a particular case.  Thus, even though the statute provides no discretion, district courts must avoid unconstitutional results by fashioning forfeiture orders that stay within constitutional bounds.

The $12.6 million forfeiture violates the Excessive Fines Clause because it is grossly disproportional to the gravity of Lam's offense given the following factors: (1) the limited nature and extent of Lam's role in Nguyen's conspiracy, (2) the absence of other related illegal activities by Lam, (3) the vast discrepancy between the forfeiture and the other applicable penalties (the forfeiture is *more than 50 times* the maximum statutory fine and *126 times* the high end of the Guidelines fine range), (4) the lack of additional harm caused by Lam's (as opposed to Nguyen's) conduct, (5) the minimal benefit reaped by Lam from the conspiracy, and (6) the impact of the forfeiture on Lam's livelihood.

The district court imposed the $12.6 million forfeiture judgment over Lam's Eighth Amendment objections without discussing these factors or engaging in any analysis whatsoever of the important constitutional issue presented.  Because the Court should conclude from the existing record that the forfeiture judgment runs afoul of the Excessive Fines Clause, it should vacate the order and remand for the limited purpose of having the district court reconsider the forfeiture.  In fact, even if the Court concludes that it cannot decide the ultimate constitutional issue at this point, it must still grant this relief given the district court's complete failure to address the constitutionality of the $12.6 million forfeiture.

16

## Standard of Review

This Court reviews de novo whether the amount of a forfeiture is grossly disproportional to the gravity of the defendant's offense and thereby unconstitutional. *United States v. Bajakajian*, 524 U.S. 321, 336-37 (1998).

## Argument

## The Court must vacate the forfeiture order under the Excessive Fines Clause of the Eighth Amendment.

### A.   The Eighth Amendment is an important safeguard that protects against the often harsh and unfair application of forfeiture statutes.

A jury found Lam guilty of conspiring to violate 18 U.S.C. §545 (Count 1) and on three substantive counts of violating §545 (Counts 2-4).[109]  The indictment included a notice-of-forfeiture count indicating that, upon any defendant's conviction, the government would seek forfeiture of the illegally-imported fish.[110] Under the criminal-forfeiture statute, 18 U.S.C. §982(a)(2)(B), "[t]he court, in imposing sentence on a person convicted of a violation of, or a conspiracy to violate ... section ... 545 ... of this title ... shall order that the person forfeit to the United States any property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of such violation."

Traditionally, forfeiture was limited to civil *in rem* proceedings directed against the "guilty property" rather than the offender himself. *United States v. Bajakajian*, 524 U.S. 321, 330 (1998).  But §982(a) "descends not from historic *in rem* forfeitures of guilty property, but from a different historical tradition: that of *in*

---

[109] 2 ER 274-92; SER 1-4.

[110] 2 ER 70-72.

17

*personam*, criminal forfeitures.  Such forfeitures have historically been treated as punitive, being part of the punishment imposed for felonies and treason in the Middle Ages and at common law. ... Although *in personam* criminal forfeitures were well established in England at the time of the founding, they were rejected altogether in the laws of this country until very recently." *Id.* at 332.  In the years since they were resurrected, the scope of *in personam* criminal forfeitures have been greatly expanded by statute and case law to reach far beyond "guilty property."  Two such expansions are most relevant here.

First, a conspirator is jointly and severally liable in forfeiture for the foreseeable gross proceeds of the conspiracy, regardless of his relative degree of culpability or how much, if any, of the proceeds he personally obtained.  For example, in *United States v. Newman*, 659 F.3d 1235, 1238-40 (9th Cir. 2011), *cert. denied*, 132 S.Ct. 1817 (2012), the government sought a $1 million forfeiture judgment under §982(a)(2) against a defendant named Tedesco, who entered into a conspiracy to commit bank fraud.  This Court held that "[i]t does not matter that he personally profited very little or that the banks eventually recovered part of the loan principals. ... For purposes of criminal forfeiture, the 'proceeds' of a fraudulently obtained loan equal the amount of the loan. ... Moreover, because Tedesco entered into a conspiracy, the 'proceeds' of his crime equal the total amount of the loans obtained by the conspiracy as a whole." *Id.* at 1244 (citing *United States v. McHan*, 101 F.3d 1027, 1043 (4th Cir. 1996) (holding that a conspirator is jointly and severally liable for proceeds resulting from the reasonably foreseeable acts of coconspirators)).  Under the statute, a district court has no discretion to reduce the amount of the forfeiture calculated in this manner to account for the defendant's role in the offense or his lack of profits; rather, "when the government meets the applicable requirements, the district court must

impose criminal forfeiture in the amount of the 'proceeds' of the crime." *Newman*, 659 F.3d at 1239.

Second, the government can get a forfeiture money judgment against a defendant who has no assets at the time of sentencing. If the actual proceeds to be forfeited are unavailable – for example, if they were sold to third parties – then "the court shall order the forfeiture of any other property of the defendant, up to the value of" the unavailable proceeds. 21 U.S.C. §853(p)(2); *see* 18 U.S.C. §982(b)(1) (forfeiture under this statute shall be governed by §853, except for subsection (d)). Although the relevant statutes do not explicitly authorize money judgments, the courts have nonetheless permitted them. For example, in *United States v. Casey*, 444 F.3d 1071, 1072-77 (9th Cir. 2006), this Court upheld a $7,000 forfeiture representing the proceeds of a narcotics sale, even though the defendant was only a middleman in the transaction and transferred those funds to the person who actually shipped the drugs. It began by noting that Congress conceived of forfeiture as a punishment and as a means to eliminate profit from certain criminal activities. *Id.* at 1073. The Court concluded that "[i]mposing a money judgment despite [a defendant's] lack of assets at sentencing negates any benefit he may have received from the money, ensuring that, in the end, he does not profit from his criminal activity. [¶] Requiring imposition of a money judgment on a defendant who currently possesses no assets furthers the remedial purposes of the forfeiture statute by ensuring that all eligible criminal defendants receive the mandatory forfeiture sanction Congress intended and disgorge their ill-gotten gains, even those already spent." *Id.* at 1074. A district court has no discretion about this either; the government is "entitled" to such a money judgment, even when the defendant is completely insolvent. *Id.* at 1077.

Lam's case demonstrates how these expansions of criminal forfeiture can lead to unfair, if not downright draconian, results. As discussed in the statement of

19

facts, Henry Nguyen was the undisputed mastermind of the conspiracy to import mislabeled frozen fish into this country to avoid the payment of duties; Lam was a low-level pawn without any real authority.[111]  While Nguyen and his father made millions, Lam made only a modest salary ($4,000 per month for about ten months) as one of Nguyen's fish salesmen.[112]  And when Nguyen escaped to Vietnam with the profits, Lam was the one left holding the bag.  If a rational concept of forfeiture applied here, then Lam wouldn't owe anything.  He never had any real control over the fish or the money from the sale of the fish; Nguyen did.  And at the time of sentencing, Lam had a negative net worth.[113]  Nevertheless, because Lam was convicted of conspiring with Nguyen, the government identified the proceeds of Lam's crime as all of the fish imported while he was a member of the conspiracy, including $12,578,676 worth of frozen fish fillets that had been illegally imported and then sold.[114]  Because that fish could not be seized and forfeited, the government obtained a money judgment against Lam for that amount.[115]

There is only one check on such outrageous forfeitures, but it's a strong one – the Eighth Amendment, which prohibits the imposition of "excessive fines[.]"[116]  The Excessive Fines Clause "'limits the government's power to extract payments, whether in cash or in kind, 'as punishment for some offense.'"  *Bajakajian*, 524

---

[111]  *See* Statement of Facts, *supra*, at pp. 4-13.

[112]  2 ER 202, 247, 254-55; SER 11, 13-14, 24.

[113]  SER 25-26.

[114]  3 ER 358-59.

[115]  1 ER 41-45.

[116]  Neither *Casey*, 444 F.3d at 1072-77, nor *Newman*, 659 F.3d at 1240-41 & n.4, considered the Eighth Amendment ramifications of their holdings.

U.S. at 328 (quoting *Austin v. United States*, 509 U.S. 602, 609-10 (1993)). That clause applies to an *in personam* criminal forfeiture like the one in this case, which "is clearly a form of punishment no different, for Eighth Amendment purposes, from a traditional 'fine.'" *Alexander v. United States*, 509 U.S. 544, 558 (1993); *see also Bajakajian*, 524 U.S. at 328 ("We have little trouble concluding that the forfeiture of currency ordered by §982(a)(1) constitutes punishment"); *Libretti v. United States*, 516 U.S. 29, 39 (1995) ("Our precedents have likewise characterized criminal forfeiture as an aspect punishment imposed following conviction of a substantive criminal offense").

Using the Eighth Amendment, "[c]ourts have traditionally exercised an important role in preventing unduly harsh applications of forfeiture statutes." *United States v. Busher*, 817 F.2d 1409, 1412 n.3 (9th Cir. 1987). Because a forfeiture statute "is quite literally without limitation, it may well exceed constitutional bounds in any particular case." *Id.* at 1414. Thus, "[e]ven though the statute provides no discretion, the district court must avoid unconstitutional results by fashioning forfeiture orders that stay within constitutional bounds." *Id.* at 1415. *See also United States v. Littlefield*, 821 F.2d 1365, 1368 (9th Cir. 1987) ("The district court ... has the constitutional responsibility to assure that a forfeiture proceeding under section 853 does not inflict excessive punishment in violation of the eighth amendment"). Close scrutiny is particularly important where, as here, a large forfeiture order is based on the conduct of coconspirators because "[i]n a case where a defendant played a truly minor role in a conspiracy that generated vast proceeds, joint and several liability for those proceeds might result in a forfeiture order grossly disproportional to the individual defendant's offense." *United States v. Jalaram, Incorporated*, 599 F.3d 347, 355 (4th Cir. 2010).

**B.** **The $12.6 million forfeiture judgment is grossly disproportional to the gravity of Lam's offense and is therefore unconstitutional.**

In *United States v. Bajakajian*, 524 U.S. at 334, the Supreme Court held "that a punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense." When applying this test, the Court is "not required to consider 'any rigid set of factors.'" *United States v. $100,348.00 in U.S. Currency*, 354 F.3d 1110, 1121 (9th Cir. 2004). But it generally starts with the four factors the Supreme Court considered in *Bajakajian*: "(1) the nature and the extent of the crime, (2) whether the violation was related to other illegal activities, (3) the other penalties that may be imposed for the violation, and (4) the extent of the harm caused." *Id.* at 1122 (following *Bajakajian*, 524 U.S. at 337-40). As explained below, two additional factors are also relevant here: (5) the minimal benefit reaped by Lam from the conspiracy, and (6) the effect of the forfeiture on Lam's livelihood. Upon considering all of these factors, the Court should conclude that the $12.6 million forfeiture judgment is grossly disproportional to the gravity of Lam's offense.

*1. The limited nature and extent of Lam's role in the conspiracy.*

With regard to the first factor, the relevant inquiry is not the nature and extent of Henry Nguyen's conspiracy; what matters is the nature and extent of Lam's role in that conspiracy. In other words, "[t]he culpability of the offender should be examined specifically, rather than examining the gravity of the crime in the abstract." *United States v. 3814 NW Thurman Street*, 164 F.3d 1191, 1197, *amended*, 172 F.3d 689 (9th Cir. 1999) (citing *Bajakajian*, 524 U.S. at 337-39); *see also $100,348.00 in U.S. Currency*, 354 F.3d at 1223 (citing *3814 NW Thurman Street*); *Jalaram*, 599 F.3d at 356 ("Jalaram's individual role in the conspiracy is certainly relevant to the gravity of its offense"). Thus the Court

22

"may consider the circumstances surrounding the defendant's criminal conduct[,]" including his "state of mind and his motive in committing the crime[.]" *Busher*, 817 F.2d at 1415.

This case brings to mind a very old fable about a sly and unscrupulous monkey who manipulates an unsuspecting cat into picking chestnuts out of a fire, so the cat ends up with a burnt paw while the monkey ends up with all of the chestnuts. The term "cat's paw" now refers to someone manipulated by another to accomplish his purpose.[117] Lam was clearly the cat's paw of Henry Nguyen. As detailed above in the statement of facts, the trial evidence established that Nguyen installed Lam (an uneducated Vietnamese immigrant) and others as figurehead presidents to insulate himself from the consequences of his criminal scheme to import mislabeled frozen fish to avoid the payment of duties.[118] There was no dispute that Nguyen was actually in total control of all of his companies, no matter who was listed on the paperwork as being in charge.[119] The government's witness Theresa Luong explained that Nguyen was intimidating and used fear to manipulate people.[120] He was an apparently-successful Vietnamese businessman whose father owned a large fishery in Vietnam.[121] In contrast, Lam had to flee Vietnam as a poor refugee and then struggled to earn a living through various blue-collar jobs in this country.[122] Under the circumstances, it's not hard to see why Nguyen used someone like Lam

---

[117] *See* OXFORD ENGLISH DICTIONARY ONLINE (2012) (definition of "cat's paw"); *Staub v. Proctor Hospital*, 560 F.3d 647, 650 (7th Cir. 2009) (recounting the fable), *reversed*, 131 S.Ct. 1186 (2011).

[118] *See* Statement of Facts, *supra*, at pp. 4-13.

[119] 2 ER 85, 174, 181, 184-85, 201-02, 235; SER 12.

[120] 2 ER 185.

[121] SER 11-12.

[122] SER 19-21, 24-25.

(naive and unlikely to question orders) to further his scheme. For his part, Lam acquiesced to Nguyen's manipulations for the opportunity to earn a relatively-modest salary so he could provide for his young son.[123]

The Eighth Circuit faced a similar situation in *United States v. Van Brocklin*, 115 F.3d 587 (8th Cir. 1997).[124] In that case, four defendants were convicted of bank fraud and the district court entered forfeiture judgments against all of them, each in the amount of about $1.3 million. *Id.* at 594, 601, 602 n.13. The Eighth Circuit vacated the forfeiture order as to the least culpable defendant (Hastings) as unconstitutionally excessive. *Id.* at 602. It noted that Hastings "was clearly a secondary figure in the crimes" whose "motive appears to have been misguided loyalty to Van Brocklin rather than a direct interest in the success of the scheme." *Id.* Her criminal conduct "'was pressed upon her by'" Van Brocklin. *Id.* She also "reaped little benefit: while the scheme earned Van Brocklin, Atterberry, and Pyatt millions of dollars, Hastings received no direct share of the proceeds." *Id.* Lam was in the same position vis-a-vis Henry Nguyen.

2. *The absence of other related illegal activities by Lam.*

The jury's special verdict reflects that it rejected the government's theory that Lam joined Nguyen's conspiracy with the intent to further all of Nguyen's illegal objectives.[125] There was certainly no evidence that Lam engaged in additional criminal activity outside of Nguyen's conspiracy.

---

[123] ER 11, 22, 24.

[124] Although this case was decided the year before *Bajakajian*, the Eighth Circuit applied the grossly-disproportionate test. *Id.* at 602.

[125] 2 ER 281-82; SER 1-4.

3. *The vast discrepancy between the forfeiture and the other applicable*
   *penalties.*

The Court should "look to 'other penalties that the Legislature has authorized'
and the 'maximum penalties that could have been imposed under the Sentencing
Guidelines' as measures of the gravity of the offense." *$100,348.00 in U.S.*
*Currency*, 354 F.3d at 1122.

The maximum statutory fine for violating §545 is $250,000. *See* 18 U.S.C.
§545, §3571(b)(3).[126] Thus the $12.6 million forfeiture is *more than 50 times* the
maximum statutory fine.

But "the maximum penalties under the Sentencing Guidelines should be
given greater weight than the statutory maximum because the Guidelines take into
account the specific culpability of the offender." *$100,348.00 in U.S. Currency*,
354 F.3d at 1122 (following *3814 NW Thurman Street*, 164 F.3d at 1197
(following *Bajakajian*, 524 U.S. at 338-39 & n.14)). The district court calculated
Lam's offense level as 24.[127] Under U.S.S.G. §5E1.2, the fine range for that
offense level is $10,000 to $100,000.[128] Thus the $12.6 million forfeiture is *126*
*times* the high end of the Guidelines range.

The gross disparity between the forfeiture and both the maximum statutory
fine and the maximum Guidelines fine is strong evidence supporting the
conclusion that the forfeiture is unconstitutionally excessive. *See United States v.*
*Varrone*, 554 F.3d 327, 332 (2nd Cir. 2009) ("This factor weighs against the
constitutionality of the forfeiture because the forfeiture amount is forty times the
statutory fine range set by Congress").

---

[126] SER 29.

[127] 1 ER 31-32.

[128] SER 29.

### 4.  The lack of additional harm caused by Lam's (as opposed to Nguyen's) conduct.

The harm resulting from Henry Nguyen's scheme was a tax loss to the government.  Given the applicable tax rate (45.55%),[129] the actual tax loss for the fish at issue is less than half of the forfeiture order, which is based on the market value of the fish.[130]

But what matters here is the harm caused by Lam's conduct.  Lam was just Nguyen's pawn.  If he hadn't naively followed Nguyen's orders, then Nguyen would have easily found someone equally manipulable who would (like Theresa Luong or Arthur Yavelberg).  In other words, Lam was not essential to the scheme.  If he wasn't around, there's no doubt that Nguyen would have done exactly the same thing with another person installed as a figurehead president of Virginia Star and ISP.

### 5.  The minimal benefit reaped by Lam from the conspiracy.

The Court may also "consider the benefit reaped by" Lam.  *Busher*, 817 F.2d at 1415.  As mentioned above, Lam earned only a salary of $4,000 per month as one of Nguyen's fish salesman for the approximately ten-month period he was part of the conspiracy; he earned no commissions, although he was allowed to live rent free in a "modest" trailer.[131]  Even with the extremely generous assumption that the free rent on the small trailer was worth $1,000 per month, Lam still only made a total of $50,000 during the course of the conspiracy.  That is just 0.4% of the $12.6 million forfeiture.

---

[129]  SER 14.

[130]  3 ER 358-59.

[131]  2 ER 202, 247, 254-55; SER 11, 14, 24.

6. *The impact of the forfeiture on Lam's livelihood.*

In *Bajakajian*, 524 U.S. at 335-36, the Supreme Court suggested that the Eighth Amendment precludes fines that would deprive a wrongdoer of his livelihood. *See also id.* at 340 n.15 (noting that the defendant in that case had not argued "that his wealth or income are relevant to the proportionality determination or that full forfeiture would deprive him of his livelihood"). The Court should therefore consider whether the $12.6 million forfeiture judgment will impede Lam's ability to support himself and his family. *See* BLACK'S LAW DICTIONARY at 945 (7th ed. 1999) (defining "livelihood" as "A means of supporting one's existence, esp. financially").

Lam has nothing.[132]  At almost 53 years old, he will soon be released from custody and will then resume his role as a single father to his teenage son.[133] Based on his sixth-grade (Vietnamese) education, his blue-collar employment history, and his conviction in this case, the chances of him doing anything more than eke out a living for the rest of his working days are slim.[134]  And as he tries to rebuild a new life for himself and his son, this massive judgment will hang over his head.  For the rest of his life, the requested money judgement will be used by the government to take a cut of whatever meager sum he is able to earn.  In other words, it will deprive Lam of his livelihood.  As Clint Eastwood said in *Unforgiven* (1992): "It's a hell of a thing, killing a man.  Take away all he's got and all he's ever gonna have."  The forfeiture order basically kills Lam economically.

---

[132]  SER 25-26.

[133]  1 ER 25; SER 19, 21-22.

[134]  SER 24-25.

_____

Again, the ultimate question is whether the requested $12.6 million forfeiture is grossly disproportionate to the gravity of *Lam's* offense. *Bajakajian*, 524 U.S. at 334. After considering all of the factors discussed above, the Court should conclude that it is.

### C.     The Court should vacate the forfeiture order and remand for the limited purpose of having the district court reconsider the forfeiture.

This Court has held that where a defendant "makes a prima facie showing that the forfeiture may be excessive, the district court must make a determination, based upon appropriate findings, that the interest ordered forfeited is not so grossly disproportionate to the offense committed as to violate the eighth amendment." *Busher*, 817 F.2d at 1415. In this case, however, the district court twice imposed a $12.6 million forfeiture judgment on Lam, over his Excessive Fines Clause objections, without any analysis whatsoever of the important constitutional issue presented.[135] In other words, it failed to satisfy its "constitutional responsibility to assure that [the] forfeiture proceeding ... [did] not inflict excessive punishment in violation of the eighth amendment." *Littlefield*, 821 F.2d at 1368.

Because the Court should conclude from the existing record that the forfeiture judgment runs afoul of the Excessive Fines Clause, it should vacate that order and remand for the limited purpose of having the district court reconsider the forfeiture. The lower court should be told to "fashion[] [a] forfeiture order[] that stay[s] within constitutional bounds." *Busher*, 817 F.2d at 1415. In fact, even if the Court concludes that it cannot decide the ultimate constitutional issue at this

_____

[135] 1 ER 2-5, 39; 3 ER 311-12, 372-77.

28

point, it must still grant this relief given the district court's complete failure to address the constitutionality of the $12.6 million forfeiture. *Id.* ("The district court in this case did not take these constitutional considerations into account in fashioning its forfeiture order, and we therefore remand for it to do so"); *Varrone*, 554 F.3d at 332-33 ("We therefore conclude that we lack factual development by the district court regarding three of the *Bajakajian* factors ... and remand to the district court to determine whether the forfeiture amount is constitutionally excessive").

DATED: July 17, 2012                    Respectfully submitted,

                                        SEAN K. KENNEDY
                                        Federal Public Defender

                                         /s/ *James H. Locklin*
                        By:     JAMES H. LOCKLIN
                                Deputy Federal Public Defender

                                        Attorneys for Appellant

# Certificate of Related Cases

Counsel for appellant is unaware of any cases currently pending in this Court that are related for purposes of Circuit Rule 28-2.6.


DATED: July 17, 2012                    /s/ *James H. Locklin*

                                    By:   JAMES H. LOCKLIN
                                          Deputy Federal Public Defender

                                          Attorney for Appellant

## Certificate of Compliance re Brief Length

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), I hereby certify that: the foregoing brief uses 14 point Times New Roman proportionately spaced type; text is double spaced and footnotes are single spaced; a word count of the word processing system used to prepare the brief indicates that the brief (not including the table of contents, the table of authorities, the statement of related cases, the certificate of compliance re brief length, the addendum, or the certificate of service) contains approximately 7,645 words.

DATED: July 17, 2012

_/s/ James H. Locklin_

By:  JAMES H. LOCKLIN
Deputy Federal Public Defender

Attorney for Appellant

**Addendum: Relevant Constitutional Provisions, Statutes, Rules, Etc.**

<u>Contents</u>

U.S. CONSTITUTION, Amendment VIII. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

18 U.S.C. §545. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

18 U.S.C. §982. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

21 U.S.C. §853. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Fed. R. Crim. Proc. 32.2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

**U.S. CONSTITUTION, Amendment VIII**

Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.

---

**18 U.S.C. §545**

Smuggling Goods Into the United States

[2005 Version]

Whoever knowingly and willfully, with intent to defraud the United States, smuggles, or clandestinely introduces or attempts to smuggle or clandestinely introduce into the United States any merchandise which should have been invoiced, or makes out or passes, or attempts to pass, through the customhouse any false, forged, or fraudulent invoice, or other document or paper; or

Whoever fraudulently or knowingly imports or brings into the United States, any merchandise contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law –

Shall be fined under this title or imprisoned not more than five years, or both.

Proof of defendant's possession of such goods, unless explained to the satisfaction of the jury, shall be deemed evidence sufficient to authorize conviction for violation of this section.

Merchandise introduced into the United States in violation of this section, or the value thereof, to be recovered from any person described in the first or second paragraph of this section, shall be forfeited to the United States.

The term "United States", as used in this section, shall not include the Virgin Islands, American Samoa, Wake Island, Midway Islands, Kingman Reef, Johnston Island, or Guam.

---

## 18 U.S.C. §982

### Criminal Forfeiture

### [2005 Version]

(a)  (1)  The court, in imposing sentence on a person convicted of an offense in violation of section 1956, 1957, or 1960 of this title, shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property.

      (2)  The court, in imposing sentence on a person convicted of a violation of, or a conspiracy to violate –

          (A)  section 215, 656, 657, 1005, 1006, 1007, 1014, 1341, 1343, or 1344 of this title, affecting a financial institution, or

          (B)  section 471, 472, 473, 474, 476, 477, 478, 479, 480, 481, 485, 486, 487, 488, 501, 502, 510, 542, 545, 842, 844, 1028, 1029, or 1030 of this title,

      shall order that the person forfeit to the United States any property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of such violation.

      (3)  The court, in imposing a sentence on a person convicted of an offense under –

          (A)  section 666(a)(1) (relating to Federal program fraud);

          (B)  section 1001 (relating to fraud and false statements);

(C)  section 1031 (relating to major fraud against the United States);

(D)  section 1032 (relating to concealment of assets from conservator, receiver, or liquidating agent of insured financial institution);

(E)  section 1341 (relating to mail fraud); or

(F)  section 1343 (relating to wire fraud),

involving the sale of assets acquired or held by the Resolution Trust Corporation, the Federal Deposit Insurance Corporation, as conservator or receiver for a financial institution or any other conservator for a financial institution appointed by the Office of the Comptroller of the Currency or the Office of Thrift Supervision, or the National Credit Union Administration, as conservator or liquidating agent for a financial institution, shall order that the person forfeit to the United States any property, real or personal, which represents or is traceable to the gross receipts obtained, directly or indirectly, as a result of such violation.

(4)  With respect to an offense listed in subsection (a)(3) committed for the purpose of executing or attempting to execute any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent statements, pretenses, representations, or promises, the gross receipts of such an offense shall include any property, real or personal, tangible or intangible, which is obtained, directly or indirectly, as a result of such offense.

(5)  The court, in imposing sentence on a person convicted of a violation or conspiracy to violate –

(A)  section 511 (altering or removing motor vehicle identification numbers);

(B)  section 553 (importing or exporting stolen motor vehicles);

(C)  section 2119 (armed robbery of automobiles);

35

(D)  section 2312 (transporting stolen motor vehicles in interstate commerce); or

(E)  section 2313 (possessing or selling a stolen motor vehicle that has moved in interstate commerce);

shall order that the person forfeit to the United States any property, real or personal, which represents or is traceable to the gross proceeds obtained, directly or indirectly, as a result of such violation.

(6)  (A)  The court, in imposing sentence on a person convicted of a violation of, or conspiracy to violate, section 274(a), 274A(a)(1), or 274A(a)(2) of the Immigration and Nationality Act or section 1425, 1426, 1427, 1541, 1542, 1543, 1544, or 1546 of this title, or a violation of, or conspiracy to violate, section 1028 of this title if committed in connection with passport or visa issuance or use, shall order that the person forfeit to the United States, regardless of any provision of State law –

(i)  any conveyance, including any vessel, vehicle, or aircraft used in the commission of the offense of which the person is convicted; and

(ii)  any property real or personal –

(I)  that constitutes, or is derived from or is traceable to the proceeds obtained directly or indirectly from the commission of the offense of which the person is convicted; or

(II)  that is used to facilitate, or is intended to be used to facilitate, the commission of the offense of which the person is convicted.

36

(B)  The court, in imposing sentence on a person described in subparagraph (A), shall order that the person forfeit to the United States all property described in that subparagraph.

(7)  The court, in imposing sentence on a person convicted of a Federal health care offense, shall order the person to forfeit property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

(8)  The court, in sentencing a defendant convicted of an offense under section 1028, 1029, 1341, 1342, 1343, or 1344, or of a conspiracy to commit such an offense, if the offense involves telemarketing (as that term is defined in section 2325), shall order that the defendant forfeit to the United States any real or personal property –

(A)  used or intended to be used to commit, to facilitate, or to promote the commission of such offense; and

(B)  constituting, derived from, or traceable to the gross proceeds that the defendant obtained directly or indirectly as a result of the offense.

(b)  (1)  The forfeiture of property under this section, including any seizure and disposition of the property and any related judicial or administrative proceeding, shall be governed by the provisions of section 413 (other than subsection (d) of that section) of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. 853).

(2)  The substitution of assets provisions of subsection 413(p) shall not be used to order a defendant to forfeit assets in place of the actual property laundered where such defendant acted merely as an intermediary who handled but did not retain the property in the course of the money laundering offense unless the defendant, in committing the offense or offenses giving rise to the forfeiture, conducted three or more separate transactions involving a total of $100,000 or more in any twelve month period.

**21 U.S.C. §853**

Criminal Forfeitures

[2005 Version]

(a)  *Property subject to criminal forfeiture*

Any person convicted of a violation of this subchapter or subchapter II of this chapter punishable by imprisonment for more than one year shall forfeit to the United States, irrespective of any provision of State law –

(1)  any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation;

(2)  any of the person's property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation; and

(3)  in the case of a person convicted of engaging in a continuing criminal enterprise in violation of section 848 of this title, the person shall forfeit, in addition to any property described in paragraph (1) or (2), any of his interest in, claims against, and property or contractual rights affording a source of control over, the continuing criminal enterprise.

The court, in imposing sentence on such person, shall order, in addition to any other sentence imposed pursuant to this subchapter or subchapter II of this chapter, that the person forfeit to the United States all property described in this subsection.  In lieu of a fine otherwise authorized by this part, a defendant who derives profits or other proceeds from an offense may be fined not more than twice the gross profits or other proceeds.

(b)  *Meaning of term "property"*

Property subject to criminal forfeiture under this section includes –

(1)  real property, including things growing on, affixed to, and found in land; and

(2)  tangible and intangible personal property, including rights, privileges, interests, claims, and securities.

(c)  *Third party transfers*

All right, title, and interest in property described in subsection (a) of this section vests in the United States upon the commission of the act giving rise to forfeiture under this section.  Any such property that is subsequently transferred to a person other than the defendant may be the subject of a special verdict of forfeiture and thereafter shall be ordered forfeited to the United States, unless the transferee establishes in a hearing pursuant to subsection (n) of this section that he is a bona fide purchaser for value of such property who at the time of purchase was reasonably without cause to believe that the property was subject to forfeiture under this section.

(d)  *Rebuttable presumption*

There is a rebuttable presumption at trial that any property of a person convicted of a felony under this subchapter or subchapter II of this chapter is subject to forfeiture under this section if the United States establishes by a preponderance of the evidence that –

(1)  such property was acquired by such person during the period of the violation of this subchapter or subchapter II of this chapter or within a reasonable time after such period; and

(2)  there was no likely source for such property other than the violation of this subchapter or subchapter II of this chapter.

(e)  *Protective orders*

(1)  Upon application of the United States, the court may enter a restraining order or injunction, require the execution of a satisfactory performance

bond, or take any other action to preserve the availability of property described in subsection (a) of this section for forfeiture under this section –

(A)  upon the filing of an indictment or information charging a violation of this subchapter or subchapter II of this chapter for which criminal forfeiture may be ordered under this section and alleging that the property with respect to which the order is sought would, in the event of conviction, be subject to forfeiture under this section; or

(B)  prior to the filing of such an indictment or information, if, after notice to persons appearing to have an interest in the property and opportunity for a hearing, the court determines that –

   (i)  there is a substantial probability that the United States will prevail on the issue of forfeiture and that failure to enter the order will result in the property being destroyed, removed from the jurisdiction of the court, or otherwise made unavailable for forfeiture; and

   (ii)  the need to preserve the availability of the property through the entry of the requested order outweighs the hardship on any party against whom the order is to be entered:

   Provided, however, That an order entered pursuant to subparagraph (B) shall be effective for not more than ninety days, unless extended by the court for good cause shown or unless an indictment or information described in subparagraph (A) has been filed.

(2)  A temporary restraining order under this subsection may be entered upon application of the United States without notice or opportunity for a hearing when an information or indictment has not yet been filed with respect to the property, if the United States demonstrates that there is probable cause to believe that the property with respect to which the order is sought would, in the event of conviction, be subject to forfeiture under this section and that provision of notice will jeopardize the

availability of the property for forfeiture. Such a temporary order shall expire not more than ten days after the date on which it is entered, unless extended for good cause shown or unless the party against whom it is entered consents to an extension for a longer period. A hearing requested concerning an order entered under this paragraph shall be held at the earliest possible time and prior to the expiration of the temporary order.

(3) The court may receive and consider, at a hearing held pursuant to this subsection, evidence and information that would be inadmissible under the Federal Rules of Evidence.

(4) *Order to repatriate and deposit*

    (A) *In general*

        Pursuant to its authority to enter a pretrial restraining order under this section, the court may order a defendant to repatriate any property that may be seized and forfeited, and to deposit that property pending trial in the registry of the court, or with the United States Marshals Service or the Secretary of the Treasury, in an interest-bearing account, if appropriate.

    (B) *Failure to comply*

        Failure to comply with an order under this subsection, or an order to repatriate property under subsection (p) of this section, shall be punishable as a civil or criminal contempt of court, and may also result in an enhancement of the sentence of the defendant under the obstruction of justice provision of the Federal Sentencing Guidelines.

(f) *Warrant of seizure*

    The Government may request the issuance of a warrant authorizing the seizure of property subject to forfeiture under this section in the same manner

as provided for a search warrant.  If the court determines that there is probable cause to believe that the property to be seized would, in the event of conviction, be subject to forfeiture and that an order under subsection (e) of this section may not be sufficient to assure the availability of the property for forfeiture, the court shall issue a warrant authorizing the seizure of such property.

(g) *Execution*

Upon entry of an order of forfeiture under this section, the court shall authorize the Attorney General to seize all property ordered forfeited upon such terms and conditions as the court shall deem proper.  Following entry of an order declaring the property forfeited, the court may, upon application of the United States, enter such appropriate restraining orders or injunctions, require the execution of satisfactory performance bonds, appoint receivers, conservators, appraisers, accountants, or trustees, or take any other action to protect the interest of the United States in the property ordered forfeited.  Any income accruing to or derived from property ordered forfeited under this section may be used to offset ordinary and necessary expenses to the property which are required by law, or which are necessary to protect the interests of the United States or third parties.

(h) *Disposition of property*

Following the seizure of property ordered forfeited under this section, the Attorney General shall direct the disposition of the property by sale or any other commercially feasible means, making due provision for the rights of any innocent persons.  Any property right or interest not exercisable by, or transferable for value to, the United States shall expire and shall not revert to the defendant, nor shall the defendant or any person acting in concert with him or on his behalf be eligible to purchase forfeited property at any sale held by the United States.  Upon application of a person, other than the defendant or a person acting in concert with him or on his behalf, the court may restrain or stay the sale or disposition of the property pending the conclusion of any appeal of the criminal case giving rise to the forfeiture, if the applicant

42

demonstrates that proceeding with the sale or disposition of the property will result in irreparable injury, harm, or loss to him.

(i)   *Authority of the Attorney General*

With respect to property ordered forfeited under this section, the Attorney General is authorized to –

(1)   grant petitions for mitigation or remission of forfeiture, restore forfeited property to victims of a violation of this subchapter, or take any other action to protect the rights of innocent persons which is in the interest of justice and which is not inconsistent with the provisions of this section;

(2)   compromise claims arising under this section;

(3)   award compensation to persons providing information resulting in a forfeiture under this section;

(4)   direct the disposition by the United States, in accordance with the provisions of section 881(e) of this title, of all property ordered forfeited under this section by public sale or any other commercially feasible means, making due provision for the rights of innocent persons; and

(5)   take appropriate measures necessary to safeguard and maintain property ordered forfeited under this section pending its disposition.

(j)   *Applicability of civil forfeiture provisions*

Except to the extent that they are inconsistent with the provisions of this section, the provisions of section 881(d) of this title shall apply to a criminal forfeiture under this section.

(k)   *Bar on intervention*

Except as provided in subsection (n) of this section, no party claiming an interest in property subject to forfeiture under this section may –

43

(1)  intervene in a trial or appeal of a criminal case involving the forfeiture of such property under this section; or

(2)  commence an action at law or equity against the United States concerning the validity of his alleged interest in the property subsequent to the filing of an indictment or information alleging that the property is subject to forfeiture under this section.

(l)  *Jurisdiction to enter orders*

The district courts of the United States shall have jurisdiction to enter orders as provided in this section without regard to the location of any property which may be subject to forfeiture under this section or which has been ordered forfeited under this section.

(m)  *Depositions*

In order to facilitate the identification and location of property declared forfeited and to facilitate the disposition of petitions for remission or mitigation of forfeiture, after the entry of an order declaring property forfeited to the United States, the court may, upon application of the United States, order that the testimony of any witness relating to the property forfeited be taken by deposition and that any designated book, paper, document, record, recording, or other material not privileged be produced at the same time and place, in the same manner as provided for the taking of depositions under Rule 15 of the Federal Rules of Criminal Procedure.

(n)  *Third party interests*

(1)  Following the entry of an order of forfeiture under this section, the United States shall publish notice of the order and of its intent to dispose of the property in such manner as the Attorney General may direct.  The Government may also, to the extent practicable, provide direct written notice to any person known to have alleged an interest in the property that is the subject of the order of forfeiture as a substitute for published notice as to those persons so notified.

44

(2)  Any person, other than the defendant, asserting a legal interest in property which has been ordered forfeited to the United States pursuant to this section may, within thirty days of the final publication of notice or his receipt of notice under paragraph (1), whichever is earlier, petition the court for a hearing to adjudicate the validity of his alleged interest in the property.  The hearing shall be held before the court alone, without a jury.

(3)  The petition shall be signed by the petitioner under penalty of perjury and shall set forth the nature and extent of the petitioner's right, title, or interest in the property, the time and circumstances of the petitioner's acquisition of the right, title, or interest in the property, any additional facts supporting the petitioner's claim, and the relief sought.

(4)  The hearing on the petition shall, to the extent practicable and consistent with the interests of justice, be held within thirty days of the filing of the petition.  The court may consolidate the hearing on the petition with a hearing on any other petition filed by a person other than the defendant under this subsection.

(5)  At the hearing, the petitioner may testify and present evidence and witnesses on his own behalf, and cross-examine witnesses who appear at the hearing.  The United States may present evidence and witnesses in rebuttal and in defense of its claim to the property and cross-examine witnesses who appear at the hearing.  In addition to testimony and evidence presented at the hearing, the court shall consider the relevant portions of the record of the criminal case which resulted in the order of forfeiture.

(6)  If, after the hearing, the court determines that the petitioner has established by a preponderance of the evidence that –

(A)  the petitioner has a legal right, title, or interest in the property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right,

45

title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section; or

(B)  the petitioner is a bona fide purchaser for value of the right, title, or interest in the property and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture under this section;

the court shall amend the order of forfeiture in accordance with its determination.

(7)  Following the court's disposition of all petitions filed under this subsection, or if no such petitions are filed following the expiration of the period provided in paragraph (2) for the filing of such petitions, the United States shall have clear title to property that is the subject of the order of forfeiture and may warrant good title to any subsequent purchaser or transferee.

(o)  *Construction*

The provisions of this section shall be liberally construed to effectuate its remedial purposes.

(p)  *Forfeiture of substitute property*

(1)  *In general*

Paragraph (2) of this subsection shall apply, if any property described in subsection (a), as a result of any act or omission of the defendant –

(A)  cannot be located upon the exercise of due diligence;

(B)  has been transferred or sold to, or deposited with, a third party;

(C)  has been placed beyond the jurisdiction of the court;

46

(D)  has been substantially diminished in value; or

(E)  has been commingled with other property which cannot be divided without difficulty.

(2)  *Substitute property*

In any case described in any of subparagraphs (A) through (E) of paragraph (1), the court shall order the forfeiture of any other property of the defendant, up to the value of any property described in subparagraphs (A) through (E) of paragraph (1), as applicable.

(3)  *Return of property to jurisdiction*

In the case of property described in paragraph (1)(C), the court may, in addition to any other action authorized by this subsection, order the defendant to return the property to the jurisdiction of the court so that the property may be seized and forfeited.

(q)  *Restitution for cleanup of clandestine laboratory sites*

The court, when sentencing a defendant convicted of an offense under this subchapter or subchapter II of this chapter involving the manufacture of amphetamine or methamphetamine, shall –

(1)  order restitution as provided in sections 3612 and 3664 of Title 18;

(2)  order the defendant to reimburse the United States, the State or local government concerned, or both the United States and the State or local government concerned for the costs incurred by the United States or the State or local government concerned, as the case may be, for the cleanup associated with the manufacture of amphetamine or methamphetamine by the defendant; and

(3)  order restitution to any person injured as a result of the offense as provided in section 3663A of Title 18.

**Fed. R. Crim. Proc. 32.2**

Criminal Forfeiture

[Current Version]

(a) *Notice to the Defendant*.  A court must not enter a judgment of forfeiture in a criminal proceeding unless the indictment or information contains notice to the defendant that the government will seek the forfeiture of property as part of any sentence in accordance with the applicable statute.  The notice should not be designated as a count of the indictment or information.  The indictment or information need not identify the property subject to forfeiture or specify the amount of any forfeiture money judgment that the government seeks.

(b) *Entering a Preliminary Order of Forfeiture*.

    (1) *Forfeiture Phase of the Trial*.

        (A) *Forfeiture Determinations*.  As soon as practical after a verdict or finding of guilty, or after a plea of guilty or nolo contendere is accepted, on any count in an indictment or information regarding which criminal forfeiture is sought, the court must determine what property is subject to forfeiture under the applicable statute.  If the government seeks forfeiture of specific property, the court must determine whether the government has established the requisite nexus between the property and the offense.  If the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay.

        (B) *Evidence and Hearing*.  The court's determination may be based on evidence already in the record, including any written plea agreement, and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable.  If

the forfeiture is contested, on either party's request the court must conduct a hearing after the verdict or finding of guilty.

(2) *Preliminary Order*.

    (A) *Contents of a Specific Order*.  If the court finds that property is subject to forfeiture, it must promptly enter a preliminary order of forfeiture setting forth the amount of any money judgment, directing the forfeiture of specific property, and directing the forfeiture of any substitute property if the government has met the statutory criteria. The court must enter the order without regard to any third party's interest in the property.  Determining whether a third party has such an interest must be deferred until any third party files a claim in an ancillary proceeding under Rule 32.2(c).

    (B) *Timing*.  Unless doing so is impractical, the court must enter the preliminary order sufficiently in advance of sentencing to allow the parties to suggest revisions or modifications before the order becomes final as to the defendant under Rule 32.2(b)(4).

    (C) *General Order*.  If, before sentencing, the court cannot identify all the specific property subject to forfeiture or calculate the total amount of the money judgment, the court may enter a forfeiture order that:

        (i)  lists any identified property;

        (ii)  describes other property in general terms; and

        (iii)  states that the order will be amended under Rule 32.2(e)(1) when additional specific property is identified or the amount of the money judgment has been calculated.

(3) *Seizing Property*.  The entry of a preliminary order of forfeiture authorizes the Attorney General (or a designee) to seize the specific property subject to forfeiture; to conduct any discovery the court

49

considers proper in identifying, locating, or disposing of the property; and to commence proceedings that comply with any statutes governing third-party rights. The court may include in the order of forfeiture conditions reasonably necessary to preserve the property's value pending any appeal.

(4) *Sentence and Judgment*.

    (A) *When Final*. At sentencing – or at any time before sentencing if the defendant consents – the preliminary forfeiture order becomes final as to the defendant. If the order directs the defendant to forfeit specific property, it remains preliminary as to third parties until the ancillary proceeding is concluded under Rule 32.2(c).

    (B) *Notice and Inclusion in the Judgment*. The court must include the forfeiture when orally announcing the sentence or must otherwise ensure that the defendant knows of the forfeiture at sentencing. The court must also include the forfeiture order, directly or by reference, in the judgment, but the court's failure to do so may be corrected at any time under Rule 36.

    (C) *Time to Appeal*. The time for the defendant or the government to file an appeal from the forfeiture order, or from the court's failure to enter an order, begins to run when judgment is entered. If the court later amends or declines to amend a forfeiture order to include additional property under Rule 32.2(e), the defendant or the government may file an appeal regarding that property under Federal Rule of Appellate Procedure 4(b). The time for that appeal runs from the date when the order granting or denying the amendment becomes final.

(5) *Jury Determination*.

    (A) *Retaining the Jury*. In any case tried before a jury, if the indictment or information states that the government is seeking forfeiture, the court must determine before the jury begins deliberating whether

either party requests that the jury be retained to determine the forfeitability of specific property if it returns a guilty verdict.

(B) *Special Verdict Form*.  If a party timely requests to have the jury determine forfeiture, the government must submit a proposed Special Verdict Form listing each property subject to forfeiture and asking the jury to determine whether the government has established the requisite nexus between the property and the offense committed by the defendant.

(6) *Notice of the Forfeiture Order*.

(A) *Publishing and Sending Notice*.  If the court orders the forfeiture of specific property, the government must publish notice of the order and send notice to any person who reasonably appears to be a potential claimant with standing to contest the forfeiture in the ancillary proceeding.

(B) *Content of the Notice*.  The notice must describe the forfeited property, state the times under the applicable statute when a petition contesting the forfeiture must be filed, and state the name and contact information for the government attorney to be served with the petition.

(C) *Means of Publication; Exceptions to Publication Requirement*. Publication must take place as described in Supplemental Rule G(4)(a)(iii) of the Federal Rules of Civil Procedure, and may be by any means described in Supplemental Rule G(4)(a)(iv).  Publication is unnecessary if any exception in Supplemental Rule G(4)(a)(i) applies.

(D) *Means of Sending the Notice*.  The notice may be sent in accordance with Supplemental Rules G(4)(b)(iii)-(v) of the Federal Rules of Civil Procedure.

(7) *Interlocutory Sale*.  At any time before entry of a final forfeiture order, the court, in accordance with Supplemental Rule G(7) of the Federal Rules of Civil Procedure, may order the interlocutory sale of property alleged to be forfeitable.

(c) *Ancillary Proceeding; Entering a Final Order of Forfeiture*.

(1) *In General*.  If, as prescribed by statute, a third party files a petition asserting an interest in the property to be forfeited, the court must conduct an ancillary proceeding, but no ancillary proceeding is required to the extent that the forfeiture consists of a money judgment.

(A) In the ancillary proceeding, the court may, on motion, dismiss the petition for lack of standing, for failure to state a claim, or for any other lawful reason.  For purposes of the motion, the facts set forth in the petition are assumed to be true.

(B) After disposing of any motion filed under Rule 32.2(c)(1)(A) and before conducting a hearing on the petition, the court may permit the parties to conduct discovery in accordance with the Federal Rules of Civil Procedure if court determines that discovery is necessary or desirable to resolve factual issues.  When discovery ends, a party may move for summary judgment under Federal Rule of Civil Procedure 56.

(2) *Entering a Final Order*.  When the ancillary proceeding ends, the court must enter a final order of forfeiture by amending the preliminary order as necessary to account for any third-party rights.  If no third party files a timely petition, the preliminary order becomes the final order of forfeiture if the court finds that the defendant (or any combination of defendants convicted in the case) had an interest in the property that is forfeitable under the applicable statute.  The defendant may not object to the entry of the final order on the ground that the property belongs, in whole or in part, to a codefendant or third party; nor may a third party object to the final order on the ground that the third party had an interest in the property.

52

(3) *Multiple Petitions*.  If multiple third-party petitions are filed in the same case, an order dismissing or granting one petition is not appealable until rulings are made on all the petitions, unless the court determines that there is no just reason for delay.

(4) *Ancillary Proceeding Not Part of Sentencing*.  An ancillary proceeding is not part of sentencing.

(d) *Stay Pending Appeal*.  If a defendant appeals from a conviction or an order of forfeiture, the court may stay the order of forfeiture on terms appropriate to ensure that the property remains available pending appellate review.  A stay does not delay the ancillary proceeding or the determination of a third party's rights or interests.  If the court rules in favor of any third party while an appeal is pending, the court may amend the order of forfeiture but must not transfer any property interest to a third party until the decision on appeal becomes final, unless the defendant consents in writing or on the record.

(e) *Subsequently Located Property; Substitute Property*.

(1) *In General*.  On the government's motion, the court may at any time enter an order of forfeiture or amend an existing order of forfeiture to include property that:

(A)  is subject to forfeiture under an existing order of forfeiture but was located and identified after that order was entered; or

(B)  is substitute property that qualifies for forfeiture under an applicable statute.

(2) *Procedure*.  If the government shows that the property is subject to forfeiture under Rule 32.2(e)(1), the court must:

(A)  enter an order forfeiting that property, or amend an existing preliminary or final order to include it; and

(B)  if a third party files a petition claiming an interest in the property, conduct an ancillary proceeding under Rule 32.2(c).

(3)  *Jury Trial Limited*.  There is no right to a jury trial under Rule 32.2(e).

# Certificate of Service

I hereby certify that on July 17, 2012, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


By:     <u>/s/ *James H. Locklin*</u>
JAMES H. LOCKLIN
Deputy Federal Public Defender